UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOSEPH M. ALLEN, | |
| Plaintiff, | Case No. C17-1625-JCC-MAT |
| v. | REPORT AND RECOMMENDATION |
| MARK MILLER, | |
| Defendant. | |

INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Joseph Allen is a state prisoner who is currently confined at the Monroe Correctional Complex (MCC) – Special Offender Unit (SOU). Plaintiff asserts in this action that defendant Mark Miller, an MCC employee, confiscated his artwork in retaliation for plaintiff filing a PREA complaint against another officer in 2012, and for plaintiff filing a grievance against defendant Miller in 2015 concerning plaintiff's artwork and art supplies. Plaintiff also asserts that defendant Miller violated his First Amendment right to freedom of expression when defendant Miller confiscated his artwork.[1]

---

[1] Mark Miller is the only defendant remaining in this action. Plaintiff identified six defendants in his amended complaint, but five of those defendants were dismissed from this action prior to service of the amended

REPORT AND RECOMMENDATION - 1

Defendant Miller now moves for summary judgment based on qualified immunity. Plaintiff has filed a response in opposition to defendant's motion,[2] and defendant has filed a reply brief in support of his motion. The Court, having carefully reviewed defendant's motion for summary judgment, all briefing of the parties, and the balance of the record, concludes that defendant's motion should be granted, and that plaintiff's second amended complaint and this action should be dismissed with prejudice.

## BACKGROUND

Defendant Mark Miller was a Custody Unit Supervisor assigned to work at the MCC-Washington State Reformatory (WSR) at all times relevant to this action. (Dkt. 39, ¶ 2.) Plaintiff was an inmate in the housing unit Mr. Miller oversaw at WSR from approximately December 22, 2011 to February 18, 2012. (*Id.*, ¶ 3.) Plaintiff was then transferred to the MCC Intensive Management Unit (IMU) and, thereafter, to other Washington Department of Corrections (DOC) facilities. (*See id.*) Plaintiff returned to WSR on November 24, 2014 and was once again placed in a unit overseen by Mr. Miller. (*See id.*)

Plaintiff claims that while he was confined at WSR in February 2012, a corrections officer named Rick Abraham exposed himself to plaintiff. (Dkt. 25 at 4.) According to plaintiff, at the

---

complaint. (*See* Dkts. 7, 8, 10.) Plaintiff's amended complaint was served only on defendant Miller. (*See* Dkt. 11.) Plaintiff was subsequently granted leave to file a second amended complaint which contained more explanation of his claims against defendant Miller. (Dkt. 24.) Plaintiff's second amended complaint (Dkt. 25) is the operative pleading in this action.

[2] Plaintiff's response is comprised of two separate documents, one which plaintiff identifies as a response to defendant's summary judgment motion and one which plaintiff identifies as a response to defendant Miller's declaration. (Dkts. 42, 43.) Plaintiff references in those documents a declaration which he claims to have filed on August 6, 2018. (*See* Dkt. 42 at 4, 5; Dkt. 43 at 1, 5.) Because the Court could find no such document in the record, the Court gave plaintiff an opportunity to supplement the record with a copy of the referenced declaration before it proceeded to disposition of defendant's summary judgment motion. (*See* Dkt. 47.) However, plaintiff responded to the Court's Order granting him leave to supplement the record by simply resubmitting his original responsive documents. (*See* Dkts. 52, 53.) Thus, the declaration referenced by plaintiff in those documents is not a part of the record and therefore could not be considered.

REPORT AND RECOMMENDATION - 2

time Mr. Abraham allegedly exposed himself, Mr. Abraham "as usual had been drinking Monarch Vodka and smoking a Pall Mall Red cigarette." (Dkt. 25 at 4.) Plaintiff claims that when Mr. Abraham exposed himself, plaintiff grabbed a handful of the officer's pubic hairs, then put those hairs in a bag and delivered the bag to Mr. Miller. (*Id*.) Plaintiff claims that he also attempted to explain to Mr. Miller what had happened with Mr. Abraham, but Mr. Miller essentially dismissed the allegation. (*See id*.) Plaintiff indicates that at some point he filed a Prison Rape Elimination Act (PREA) complaint regarding the alleged incident involving Mr. Abraham. (*Id*. at 4, 6-7.)

Mr. Miller, in response to this recitation of events by plaintiff, states that he was not aware of the events detailed by plaintiff in his pleading, including those about a DOC employee smoking, drinking and exposing himself, and he does not believe they actually occurred. (Dkt. 39, ¶ 4.) Mr. Miller also denies that plaintiff ever brought a bag of pubic hairs to him or told him what had happened, and he maintains that he was not aware of any PREA complaint filed by plaintiff against Mr. Abraham. (*Id*.) According to Mr. Miller, DOC staff members rarely know about PREA complaints because they are confidential. (*Id*.)

Plaintiff was transferred to the MCC-IMU on February 18, 2012, the day after the alleged incident involving Mr. Abraham. (Dkt. 25 at 4.) When plaintiff returned to WSR in November 2014, he was initially allowed to keep in his cell a large number of drawings and sketches that he had done over the course of the preceding two and a half years but, according to plaintiff, Mr. Miller would not let him have his art supplies or his paintings. (Dkt. 25 at 5.) Plaintiff claims that on January 12, 2015, after being advised by his prison counselor that Mr. Miller wanted him to throw away his art and art supplies, he filed a grievance. (*Id*. at 5-6.) On January 16, 2015, plaintiff spoke with grievance coordinator Pete Maxson about his grievance, and during that conversation Mr. Maxson called Mr. Miller and told him that plaintiff was claiming Mr. Miller

REPORT AND RECOMMENDATION - 3

was trying to steal his art and art supplies. (Dkt. 25 at 6.)

Plaintiff claims that after he returned to his cell from his meeting with Mr. Maxson, Mr. Miller was waiting for him and told him "you like to file complaints, well so do I." (*Id*.) Plaintiff further claims that Mr. Miller then directed another corrections officer to search plaintiff's cell and bring him all the papers found in the cell. (*Id*.) Mr. Miller denies making the comment attributed to him by plaintiff, and he also denies ordering the search of plaintiff's cell because of any grievance filed by plaintiff. (Dkt. 39, ¶ 6.) Mr. Miller acknowledges, however, that he did authorize a search of plaintiff's cell after being made aware by Recreational Supervisors Parker and Goff that plaintiff had possible contraband in his cell. (*See id.*, ¶ 7. *See also* Dkt. 25 at 14.)

During the search, a large number of paintings, drawings, and hobby items were removed from plaintiff's cell so they could be more closely inspected. (Dkt. 39, ¶ 7.) It was thereafter determined that many of the art supplies which were removed during the search had not been purchased by plaintiff and were not authorized for his retention. (*Id*.) Also removed during the search was plaintiff's "IDEA" book which, according to Mr. Miller, contained drawings depicting violence, sexually explicit art with nudity, torture and bestiality.[3] (*Id*.)

Mr. Miller maintains that he was authorized to confiscate seized items deemed contraband under DOC policy and applicable regulations, and that such items included plaintiff's pictures and drawings. (Dkt. 39, ¶ 9.) Mr. Miller claims that non-contraband items which were seized, but for which plaintiff could provide proof of ownership, were returned to plaintiff so long as the items were allowable under offender property policies. (*Id*., ¶ 10.) Plaintiff was permitted to go through the items that were deemed non-contraband, but which could not be returned to him, and decide

---

[3] Defendant Miller refers to this book as plaintiff's IDEA book, but plaintiff states that the book referenced by defendant was actually plaintiff's sketch book. (Dkt. 42 at 2.)

REPORT AND RECOMMENDATION - 4

what he wanted to send out and what would be destroyed instead.  (Dkt. 39, ¶ 10.)  Plaintiff acknowledges that he continues to draw and paint, which his mental health provider endorses as being beneficial to maintenance of plaintiff's mental health, but claims he doesn't do sexually explicit or excessively violent art because "it doesn't sell in mainstream America and it's against the Rules.  (*See* Dkt. 25 at 7-8, 11, 16.)

Plaintiff alleges in his second amended complaint that Mr. Miller confiscated his artwork in retaliation for plaintiff filing a PREA complaint against Mr. Abraham in 2012, and for plaintiff filing a grievance against Mr. Miller in 2015 concerning his artwork and art supplies.  (*See id*. at 6-7.)  Plaintiff also claims that Mr. Miller violated his First Amendment right to freedom of expression when Mr. Miller confiscated his artwork.  (*See id*. at 11.)  Plaintiff asserts that though Mr. Miller tried to claim the artwork was sexually explicit or violent, other institutional staff members and officials disagreed and actually instructed defendant Miller to return the artwork, which defendant Miller refused to do.  (*Id*. at 6-7.)

Mr. Miller argues in his summary judgment motion that he is entitled to qualified immunity because his actions did not deprive plaintiff of a constitutional or statutory right.  (*See* Dkt. 38.)  He further argues that even if plaintiff has established a violation of a protected right, there is no clearly established law that confiscating contraband from an inmate for legitimate penological reasons is unconstitutional.  (*Id*.)

## DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails

REPORT AND RECOMMENDATION - 5

to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The

REPORT AND RECOMMENDATION - 6

mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

<u>Section 1983 Standard</u>

In order to sustain a civil rights action, a plaintiff must show (1) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) that the violation was proximately caused by a person acting under color of state or federal law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong, a plaintiff must allege facts showing how individually named defendants caused, or personally participated in causing, the harm alleged in the complaint. *See Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the complained of deprivation. *Id*. (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

<u>Qualified Immunity</u>

Qualified immunity protects § 1983 defendants from liability for civil damages so long as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashroft v. al-Kidd*, 563 U.S. 731, 743

REPORT AND RECOMMENDATION - 7

1  (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

2  In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court set forth a two-prong test to be applied in evaluating claims of qualified immunity: (1) whether the facts alleged, when taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right; and (2) whether the right was clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202.

## Retaliation

A viable claim of First Amendment retaliation within the prison context has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

In order to prevail on a retaliation claim, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation and internal quotation omitted). In addition, a plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995). The Court evaluates a retaliation claim in light of the deference accorded prison officials. *Id*. at 807.

Plaintiff claims that defendant Miller searched his cell and confiscated his artwork in retaliation for plaintiff filing a PREA complaint against another corrections officer, Mr. Abraham, in 2012. Defendant Miller maintains that he was unaware of the PREA complaint, and that it

REPORT AND RECOMMENDATION - 8

therefore would have been impossible for him to have retaliated against plaintiff years later for filing such a complaint. (Dkt. 39, ¶ 4.) Plaintiff, in his materials filed in response to defendant's summary judgment motion, claims that defendant Miller must have been aware of the PREA complaint plaintiff filed against Mr. Abraham in 2012 because (1) defendant Miller, by policy, was a part of the PREA Response Team, (2) plaintiff personally took a bag of Mr. Abraham's pubic hairs to defendant Miller and told him about the incident giving rise to the PREA complaint, and (3) plaintiff was told by PREA investigators that defendant Miller had been contacted regarding the complaint. (*See* Dkt. 43 at 2.)

While plaintiff offers a number of reasons why he believes defendant Miller must have been aware of the PREA complaint, he offers no actual evidence to support his assertions in this regard. More significantly, nothing in the record before this Court establishes any connection between the 2012 PREA complaint and the dispute over plaintiff's artwork which occurred almost three years later. Plaintiff's suggestion that defendant Miller retaliated against him because of the 2012 PREA complaint is speculative at best and insufficient to establish any violation of plaintiff's First Amendment rights.

Plaintiff also claims that defendant Miller retaliated against him because he filed a grievance against defendant Miller after being advised by his prison counselor that defendant Miller wanted him to throw away his art and his art supplies. (*See* Dkt. 25 at 5.) Plaintiff asserts that he filed the grievance on January 12, 2015, and was called out to see the grievance coordinator, Pete Maxson, on January 16, 2015 at which time they discussed the grievance. (*Id*. at 6.) According to plaintiff, after he explained to Mr. Maxson what was going on, Mr. Maxson called defendant Miller and told him that plaintiff was saying he was trying to steal plaintiff's art and supplies. (Dkt. 25 at 6.) Plaintiff maintains that when he returned to his unit after speaking with

REPORT AND RECOMMENDATION - 9

Mr. Maxson, defendant Miller was waiting for him and told him "you like to file complaints, well so do I" before instructing another corrections officer to search plaintiff's cell and bring him all the papers in it. (*Id.*) When plaintiff returned to his cell a short time later, all of his drawings and sketches were gone, as was his legal work and what he calls his IDEA Book. (*Id.*)

Defendant Miller denies making the statement attributed to him by plaintiff, states that he does not recall the phone call about the grievance, and maintains that he did not order plaintiff's cell to be searched because of a grievance. (Dkt. 39, ¶ 6.) According to defendant Miller, he had been made aware of possible contraband in plaintiff's possession by Recreational Supervisors Parker and Goff, and it was those concerns which prompted him to authorize a cell search. (*Id.*, ¶ 7.) Defendant Miller notes as well that the search did, in fact, reveal that plaintiff had contraband in his possession, including art supplies which had not been purchased by plaintiff and were not authorized for his retention, and a book which contained drawings depicting violence, sexually explicit art with nudity, torture and bestiality. (*Id.*)

Evidence in the record in the form of a grievance response prepared by Mr. Maxson following the search of plaintiff's cell confirms that Mr. Maxson spoke to defendant Miller about plaintiff's grievance regarding his artwork and art supplies in plaintiff's presence, suggesting that defendant was aware, at least at that time, of plaintiff's complaint. (*See* Dkt. 25 at 15.) Plaintiff maintains that this conversation and the search of his cell occurred on the same date, January 16, 2015. Defendant Miller offers nothing to rebut this assertion. The apparent proximity in time between when defendant Miller learned of plaintiff's grievance, and when plaintiff's cell was searched and all of his artwork was confiscated, certainly suggests a connection between the two events.

However, as explained above, in order to prevail on his retaliation claim, plaintiff bears the

REPORT AND RECOMMENDATION - 10

burden of establishing both that his protected conduct was the substantial or motivating factor behind the defendant's challenged conduct, and that the conduct did not did not advance legitimate correctional goals.  This plaintiff has not done.  Defendant submitted with his summary judgment motion copies of some of the artwork seized from plaintiff's cell during the search in question.  (*See* Dkt. 37.)  Those copies confirm that at least some of plaintiff's confiscated artwork contained graphic depictions of violence directed towards corrections officers, and some of it clearly constituted prohibited "sexually explicit material" as that term is defined in the Washington Administrative Code (WAC).  *See* WAC 137-48-020(13).[4]

In his response to defendant's summary judgment motion, plaintiff claims that none of the officers who had previously gone through his artwork had identified it as sexually explicit or violent, and that it wasn't until January 2015 when Mr. Maxson advised defendant Miller about the grievance that the artwork became sexually explicit or violent.  (*See* Dkt. 42 at 2-3.)  This claim overlooks the simple fact that at least some of the artwork seized clearly met the WAC definition of prohibited sexually explicit material and some was, objectively speaking, quite violent in nature.

---

[4] At times relevant to the events at issue in this action, prohibited sexually explicit materials were defined in the WAC as follows:

"Sexually explicit materials" consist of any item displaying, portraying, depicting, or describing:

(a) Nudity, which includes exposed/visible (in whole or part, including under or through translucent/thin materials providing intimate physical detail) genitals/genitalia, anus, and/or female/transgender breast nipple(s);

(b) A sex act(s) which includes, but is not limited to, genital-genital, oral-genital, anal-genital, or oral-anal contact/penetration, genital or anal contact/penetration with an inanimate object, masturbation, sadistic/masochistic abuse, bondage, bestiality, and/or bodily excretory behavior which appears sexual in nature;

(c) A participant(s) who appears to be nonconsenting, dominated, degraded, humiliated, or in a submissive role, and/or acting in a forceful, threatening, dominating, or violent manner which appears to be sexual in nature; and/or

(d) Minor(s), or models depicting minors, in a sexually suggestive setting/pose/attire.

WAC 137-48-020(13) (2015).

REPORT AND RECOMMENDATION - 11

Whether or not any other officer had identified it as such does not undermine this basic fact.

The decision to search a prisoner's cell based on a suspicion that the prisoner is in possession of items prohibited by institutional rules, advances the legitimate penological interest of maintaining safety, security and order within the facility. In this instance, the search of plaintiff's cell confirmed that he was in possession of prohibited materials which were then confiscated in accordance with institutional rules. Given this evidence, this Court must conclude that plaintiff has established neither that the grievance against defendant Miller was the motivating factor behind the cell search, nor that the search, and subsequent confiscation of plaintiff's artwork and art supplies, did not advance legitimate penological goals. Plaintiff therefore has not established any violation of his First Amendment rights.

<u>Freedom of Expression</u>

It is well established that a convicted prisoner does not forfeit all constitutional protections as a result of his confinement. *Michenfelder v. Sumner*, 860 F.2d 328, 331 (9th Cir. 1988) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). However, those rights may, of necessity, be restricted in the prison context. *Hudson v. Palmer*, 468 U.S. 517 (1984).

A prison regulation that encroaches on an inmate's constitutional rights is valid only if it is reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987). In *Turner*, the Supreme Court identified four factors for courts to consider in applying this rational relationship test: (1) the existence of a 'valid, rational connection' between the regulation and the legitimate governmental interest put forward to justify it; (2) the existence of an alternative means of exercising the rights that remain open to the prisoner; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives that fully accommodate the inmate's rights at

REPORT AND RECOMMENDATION - 12

a de minimis cost to valid penological objectives. *Turner* 482 U.S. at 89-91.

Legitimate penological interests include "security, order, and rehabilitation." *Procunier v. Martinez*, 416 U.S. 396, 413 (1974). A reviewing court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The burden is not on the state to prove the validity of a challenged regulation, but is instead on the inmate to disprove it. *Id.*

Plaintiff claims that the confiscation of his artwork violated his First Amendment right to freedom of expression. Defendant argues in his summary judgment motion that he had the authority to confiscate contraband items in plaintiff's possession, and that there is a legitimate penological interest in preventing plaintiff from possessing the contraband at issue in this case; *i.e.*, art supplies that did not belong to him and sexually explicit materials. (*See* Dkt. 38 at 8-10; Dkt. 39, ¶¶ 9, 11, 12.) Contraband is defined in the WAC as "all illegal items, alcoholic beverages, and other items which a resident of a correctional institution may not have in his possession, as defined in regulations adopted by the superintendent of an institution and approved by the secretary." WAC 137-36-020(1). Among the items a prisoner is not permitted to have in his or her possession are items they don't own, and sexually explicit materials as defined in WAC 137-48-020. *See* WAC 137-25-030, #555, #728.

Defendant Miller states that it is vital in the prison setting that inmates follow established rules as prison is a structured environment. (Dkt. 39, ¶ 11.) Defendant Miller explains that the rule that an inmate may not possess another offender's property is necessary because disputes over property "can and have resulted in violent altercations and extortion," and allowing inmates to possess property that does not belong to them therefore is a safety and security issue for both

REPORT AND RECOMMENDATION - 13

offenders and staff. (Dkt. 39, ¶ 11.) Defendant Miller further explains that it is necessary to restrict offenders from creating and viewing sexually explicit materials because

> allowing [offenders] the unrestricted ability to draw graphic, violent, and sexually explicit materials can and has led to the bartering of sexually explicit materials. Bartering of anything that is valued by inmates in the prison setting, including sexually explicit drawings, can lead to extortion, disputes over ownership, and violent altercations between inmates. Anatomical comparisons triggered by sexually explicit images can also lead to fights between inmates. Finally, allowing such drawings could also expose corrections officers to sexual harassment, which is strictly forbidden within DOC.

(*Id.*, ¶ 12.)

Plaintiff does not appear to challenge the validity of the regulations which prohibit the possession of sexually explicit materials, nor the purported prohibition on the possession of materials depicting violence. (*See* Dkt. 25 at 11.) Plaintiff appears instead to challenge the characterization of his artwork as falling within these prohibited categories. (*See id.*; Dkt. 42 at 10.) However, the evidence in the record makes clear that at least some of plaintiff's artwork was graphic, violent, and sexually explicit, and therefore prohibited and properly seized as contraband. (*See* Dkt. 37; Dkt. 25 at 12.) The evidence also demonstrates that artwork and art supplies which were not found to be contraband, were either returned to plaintiff, or plaintiff was given an opportunity to mail out items not allowed in the facility. (*See* Dkt. 39, ¶ 10; Dkt. 25 at 16, 18, 23.)

Legitimate security concerns justified the restrictions on plaintiff's possession of property that did not belong to him and on his possession of violent and/or sexually explicit artwork. The record makes clear that plaintiff has continued to draw and paint, and that he has been encouraged to do so long as his artwork comports with DOC guidelines. (*See* Dkt. 25 at 11, 16; Dkt. 39, ¶ 13.) The facts alleged by plaintiff, and the evidence in the record, simply do not support plaintiff's claim that defendant Miller violated his right to freedom of expression when he confiscated some,

REPORT AND RECOMMENDATION - 14

but not all, of plaintiff's artwork and art supplies.

<u>Deprivation of Property</u>

It is not clear from plaintiff's second amended complaint whether he intended to assert a Fourteenth Amendment claim against defendant Miller based on the alleged deprivation of his personal property. Plaintiff alleges in his pleading that defendant Miller was directed by his superiors to return plaintiff's confiscated artwork, but defendant Miller failed to comply with that directive. (Dkt. 25 at 7.) Plaintiff also alleges in his pleading that defendant Miller agreed to return his artwork and art supplies, but never did so. (*See id*. at 7-9.) These allegations could arguably be deemed to assert a deprivation of property claim against defendant Miller and, thus, the Court will briefly address the issue.

The Due Process Clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend. V. However, where a state employee's random, unauthorized act deprives an individual of property, either negligently or intentionally, the individual is relegated to his state post-deprivation process, so long as the state provides an adequate post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 540-41 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). Washington State provides a post-deprivation remedy for the alleged tortious conduct of state employees under RCW 4.92. Thus, any claims pertaining to the loss of plaintiff's personal property are not cognizable in this action.

<u>CONCLUSION</u>

As explained above, plaintiff has not established any violation of his federal constitutional rights in this action. This Court therefore recommends that defendant Miller's motion for summary judgment based on qualified immunity be granted, and that plaintiff's second amended complaint

REPORT AND RECOMMENDATION - 15

1  and this action be dismissed with prejudice. This Court further recommends that plaintiff's request for admissions from defendant Miller, and his request to "put this case back on track," be stricken as moot. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect the right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **February 15, 2019**.

DATED this 18th day of January, 2019.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 16